UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

JEFFREY D. PEREZ,                    )
                                     )
                Plaintiff,           )
                                     )
        v.                           )        CAUSE NO. 3:15-CV-496-JD-MGG
                                     )
NOE MARANDET, et al.,                )
                                     )
                Defendants.          )

<u>OPINION AND ORDER</u>

Jeffrey D. Perez, a prisoner without a lawyer, was granted leave to proceed

against Dr. Noe Marandet and Nurse Lee Ann Ivers in their individual capacities

for preventing him from receiving medical treatment and surgery for his feet from

August 2014 until March 2015, in violation of the Eighth Amendment.[1] (ECF 9.) Dr.

Marandet and Nurse Ivers filed a motion for summary judgment. (ECF 42.) The

summary judgment motion was accompanied by a notice (ECF 44), as required by N.D.

Ind. L.R. 56-1(f), which informed Perez of the importance of responding. Perez has

responded to the motion,[2] and the defendants have replied. For the following reasons,

the court denies the summary judgment motion.

Summary judgment must be granted when "there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Federal

---

[1] Perez's other claims, including his claim against Corizon, were dismissed. (ECF 9.)

[2] To the extent that Perez's response brief raises arguments relevant to claims already dismissed,
his arguments will be disregarded by the court.

Rule of Civil Procedure 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* In deciding whether summary judgment is appropriate, the deciding court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). A party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in his or her own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). If the nonmoving party does not establish the existence of an essential element on which that party bears the burden of proof at trial, summary judgment is proper. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006). Summary judgment "is the put up or shut up moment in a lawsuit ...." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008).

FACTS

Perez has been incarcerated since 2006. (*See* ECF 47-2 at 2.) He has a history of congenital talipes equinovarus, commonly known as clubfoot, and has had multiple bilateral foot surgeries. (ECF 44-1 at ¶ 7.) Clubfoot is a birth defect where one or both

feet are rotated internally at the ankle. (*See* ECF 44-1 at ¶ 7;

https://www.encyclopedia.com/medicine/diseases-and-

conditions/pathology/clubfoot). Orthopedic surgeons are generally in agreement that

the initial treatment for clubfoot should be nonoperative and "should begin in the first

days of life to take advantage of the favorable fibroelastic properties of the foot's

connective tissues." (*Id.*) In infants, a series of casts is commonly applied over a period

of months, which aligns the foot. (*Id.*) When surgery is required, the condition is usually

severe and not completely correctable, although improvements are possible. (*Id.*)

Clubfoot is much more difficult to treat in an adult. Much of the research on

treating neglected clubfoot in adults comes from third world countries where early

childhood intervention may not be available. (*See* ECF 44-1 at ¶ 7;

http://www.ptolemy.ca/members/archives/2011/Clubfoot/index.html.) A neglected

clubfoot is one that has either not been treated or has been inadequately treated. (*Id.*)

Without treatment, the deformity is made worse over the years by weight-bearing on

the lateral side or dorsum of the foot, which exaggerates the abnormal shape of the foot

and causes further deformation. (*Id.*)

There is a progression in treatment of clubfoot beginning with manipulation and

casting in young patients (under age four), to soft tissue surgery, to soft tissue surgery

combined with midfoot osteotomies (cutting foot bones to change their alignment), to

osteotomies alone, and then, if all else fails, to arthrodesis (fusion of foot bones). (*See*

ECF 44-1 at ¶ 7;

http://www.ptolemy.ca/members/archives/2011/Clubfoot/index.html.) Although

generally considered a last resort, arthrodesis remains a common operation in low-income countries as a final attempt to achieve some measure of stability for a painful, rigid clubfoot in a skeletally mature individual. (*Id*.) Surgeons generally try to avoid these type of fusions, but sometimes pain and deformity reach the point where this procedure offers a chance of producing a better aligned and less painful foot. (*See* ECF 44-1 at ¶ 7; http://www.aofas.org/footcaremd/treatments/Pages/Triple-Arthrodesis.aspx.

Both of Mr. Perez's feet are severely deformed and significantly smaller than expected for a man of his size. (*Id*. at ¶ 9.) Perez's foot deformities affect his mobility and cause him discomfort. (*Id*.) He has underwent numerous surgeries throughout his lifetime in an attempt to correct his condition, but none have been completely successful. (ECF 44-1 at ¶ 9; ECF 47-3 at ¶ 3.) And, his condition has deteriorated since his incarceration in 2006. (ECF 47-2 at 2.) Although it is unclear what treatment Perez received for his clubfoot condition prior to incarceration, Perez has received extensive treatment while incarcerated. (ECF 44-1 at ¶ 8.) Because there is no cure or surgical fix, treatment throughout his incarceration has focused on managing his symptoms and assisting with ambulation. (*Id*. at ¶ 10.) While incarcerated, he has been prescribed canes, crutches, a wheelchair, and orthopedic shoes to assist him in ambulating. (*Id*. at ¶ 9.) A surgery was performed in April of 2013, while Perez was housed at Indiana State Prison (ISP), but it left him in more pain. (*Id*. at 16.)

On June 3, 2014, Perez was transferred from ISP to Miami Correctional Facility. (*Id*. at ¶ 11.) On intake, he complained of pain to Lisa M. VanOuse, LPN. (ECF 47-3 at ¶

8.) Orders for a wheelchair, orthopedic shoes, and crutches/cane were entered as a continuing order from Perez's prior facility. (ECF 44-1 at ¶ 11.) Nurse Lee Ann Ivers, R.N., the Director of Nursing at MCF, completed a disability classification form on June 6, 2014, classifying Perez as disabled. (ECF 47-1 at 2; ECF 47-3 at ¶ 9.) As the Director of Nursing at MCF, Nurse Ivers was responsible for supervising the nursing staff in the facility, ensuring that physicians' orders were being followed by nursing staff, and ensuring that nursing staff observed all policies and protocols. (ECF 44-3 at ¶ 6.) In that position, she did not normally see patients unless an emergency or special situation called for her involvement. (*Id.*)

On June 18, 2014, Perez was seen by Timothy Neff, a member of the nursing staff, for his complaints of pain in both feet related to his clubfoot condition. (ECF 44-1 at ¶ 12; ECF 44-2 at 205-06.) He was referred to a medical provider for further assessment. (*Id.*)

Dr. Marandet first saw Perez the next day, on June 19, 2014. (ECF 44-1 at ¶ 13; ECF 44-2 at 203-04.) He noted that multiple surgeries had been performed on Perez's clubbed feet while he was incarcerated at ISP. (*Id.*) He had been issued a pair of orthopedic shoes while at ISP, but Perez said they must have gotten lost during his transfer. (*Id.*) Perez told Dr. Marandet that he had contacted the Health Services Administrator at MCF about replacing the shoes. (*Id.*) Dr. Marandet noted that he would check to see if the orthopedic shoes could be located. (*Id.*) Perez claims he explained his past surgeries and the extent of his pain and suffering to Dr. Marandet in great detail at this meeting, and that he requested a consultation with a podiatrist. (ECF

47-2 at 2; ECF 47-3 at ¶ 11.) Even though Perez indicated he needed help "now," he received neither pain medication nor a referral to see a podiatrist. (ECF 44-2 at 203-04; ECF 47-2 at 2; ECF 47-3 at ¶ 11.)

On August 7, 2014, Perez was again seen by Nurse Neff for complaints of continuing foot pain related to his surgery the year before. (ECF 44-1 at ¶ 14; ECF 44-2 at 199-200.) He reported moderate pain in both feet with motion. (*Id.*) He requested to be seen by the surgeon who had performed his foot surgery. (*Id.*) Prednisone and Tylenol were prescribed. (ECF 44-2 at 199-200.)

On August 21, 2014, Dr. Marandet saw Perez for a chronic care visit. (ECF 44-1 at ¶ 16; ECF 44-2 at 190-94.) Perez continued to report pain in both feet as a result of his foot surgery in April of 2013. (*Id.*; ECF 47-3 at ¶ 12.) No pain medication was prescribed, but Dr. Marandet submitted a consultation request that Perez be further evaluated by a podiatrist. (ECF 44-1 at ¶ 16; ECF 44-2 at 190; ECF 47-3 at ¶ 12.) In the consultation request, Dr. Marandet noted that Perez had undergone surgery for repair of bilateral clubfoot in April of 2013 and that Perez stated his feet were in worse shape after surgery. (ECF 44-1 at ¶ 16; ECF 44-2 at 190.) Dr. Marandet noted that Perez's toes were deformed and that Perez had been wheelchair-bound for years. (*Id.*) Although Perez had been seen multiple times by podiatrists for treatment of his clubfoot condition, Dr. Marandet believed that another podiatry consultation might be of value in determining a future course of treatment. (ECF 44-1 at ¶ 16.) Perez's medical records do not reflect a response to the request for podiatry consultation dated August 21, 2014. (*Id.*)

Defendants speculate that the response was misplaced or took "longer than usual." (ECF 43 at 16.)

On August 28, 2014, Perez filed a formal grievance. (ECF 47-3 at ¶ 13; 43-1 at 3.) In his grievance, Perez indicated that the doctor "put in for [him] to see podiatrist" but he had not yet seen the podiatrist. He explained further:

> D.O.C. sent me to a podiatrist because of my club feet about a year ago. In that time I've had three operations done on both feet. I've been having problems for awhile now since them operations. My left foot my toes are bending to the side on top of each other (they look broke) and my right foot my toes are bending under my foot. I seen the Dr. here at this facility because of this and he seen how messed up my feet are and right there he put me in to see the Podiatrist who work on me. This is a real problem. I'm in pain all the time. If something is not done it will get worse. I'm now in a wheelchair because of this where I was not before the operations.

(ECF 47-1 at 3.) He again requested that he be seen by the podiatrist that did his operations. (*Id.*) At the time Perez filed the grievance, he had already tried to resolve the issue informally by speaking with Dr. Marandet. Perez indicated in the grievance that Dr. Marandet said he did not know what happened but he would resubmit the request. (ECF 47-1 at 3.) Medical records do not demonstrate that the consultation request was resubmitted.

Nurse Ivers, whose duties included assisting the grievance coordinator at MCF in responding to inmate grievances regarding medical care, was contacted in response to Perez's August 28, 2014, grievance. (*Id.* at ¶ 9; ECF 44-3 at ¶ 6.) In investigating a medical grievance, Nurse Ivers would review the inmate's medical records, including any consultation requests. (ECF 44-2 at ¶ 6.) She would then submit a response to the

7

grievance coordinator based on the inmate's medical records and any input from the medical provider. (*Id.*) She did not have authority to change or interfere with a prescribed medical treatment or a consultation request. (*Id.*)

On September 6, 2014, Perez had not yet received a response to his grievance, and he wrote Nurse Ivers. (ECF 47-3 at ¶ 14.)

> On 8-7-14[3] I seen facility Dr. (here at MCF) because my toes on my left foot are bent over each other it looks [like] it's out of socket or broken, and my toes on my right foot are bent down almost under my foot. (And this is after the surgeries I had on both feet in the past year and a half)[.] When I showed the Dr. my feet he said he will send me for X-rays and it still hasn't happened. There is something really wrong and I'm in a lot of pain.
>
> I'm really tired of this INADEQUATE medical care, and want to know what's going on with those X-RAYS.

(ECF 47-1 at 6.)

Nurse Ivers responded by indicating that:

> The provider did not order an Xray. He did put a consult for you to see a specialist. Awaiting approval. I will email provider consult again today 9/15/14.

(*Id.*)

On September 24, 2014, Grievance Executive Assistant R. Bynun responded to Perez's formal grievance as follows:

> While investigating this grievance, Ms. Ivers in the medical department was contacted. Dr. Marandet has submitted a consultation form in regards to you being re-evaluated by the provider who performed your surgery. The Regional Medical Director approves all consults, and is requesting records from

---

[3] Medical records show that Perez saw Nurse Neff on August 7, 2014, and Dr. Marandet on August 21, 2018. This discrepancy in dates is not material to the outcome of the instant summary judgment motion.

the surgeon. You will be called to the medical department to sign medical release forms. In order for Corizon to obtain these records you must sign the release forms. This is a process and takes time. We are making all efforts in getting you back to your surgeon. We apologize for the inconvenience. It appears that you are receiving the appropriate medical care, and your grievance is addressed.

(ECF 47-1 at 5.)

Although Nurse Ivers does not recall if she personally contacted the medical records department regarding obtaining a signed release, there is a medical records release dated October 4, 2014, in Perez's medical records. (ECF 44-3 at ¶ 9.) Nurse Ivers' only involvement in the grievance process was to inform the inmate, through a grievance report, of the status of his medical treatment. (*Id.*) She was not part of the process of submitting or approving a request for consultation that Perez be seen by a podiatrist. (*Id.*)

On October 3, 2014, Dr. Marandet forwarded a non-formulary tracking form to the Regional Medical Director updating a renewal request for a cane, wheelchair, and orthopedic shoes for Perez to assist him with ambulating. (ECF 44-1 at ¶ 17; ECF 44-2 at 178; ECF 47-1 at 7.) Dr. Marandet notes that:

He has deformities of both feet, due to being born with cleft feet. He has club feet and claw toes and has had multiple surgeries to try and straighten his toes. His feet remain markedly deformed and the surgeon requested a wheelchair. It was previously approved for 30 days, but he has no improvement as he still has to wrap his feet for support. He has multiple pins and screws in his feet. He was given orthopedic shoes to wear, as his feet are different sizes.

(ECF 44-2 at 178; ECF 47-1 at 7.)

On October 15, 2014, Perez's ex-wife, Omayra Melecio-Romero, sent him an email through the prison's Jpay system, stating the following:

> I called Ms. Ivers, she said she is making sure you are well taken care of, its [sic] just some paperwork that was required by the people down state; so don't worry all your medical needs will get taken care of. She was required to get a lot of paperwork from your Podiatrist, but all has been sent finally down state.

(ECF 47-1 at 15-16.)

On November 11, 2014, roughly two and a half months after Dr. Marandet submitted the consultation request, Perez again wrote Nurse Ivers.

> I [sic] sending out this to find out what's going on with me going to see the Podiatrist that did my surgeries? You told me down state needed some paperwork from the Podiatrist and I had to sign a paper so they can get that paperwork. I signed that paperwork on Sept. 5, 2014. I still haven't been told anything. I need to know whats [sic] going on.

(ECF 47-1 at 9.)

On November 19, 2014, Kimberly Myers, APN, saw Perez for a provider visit in response to his request that the delay in receiving his orthopedic shoes be investigated. (ECF 44-1 at ¶ 18; ECF 44-2 at 169-73.) Myers submitted a request that Perez be evaluated for replacement orthopedic shoes. (*Id*.) He received the shoes on December 8, 2014. (ECF 44-1 at ¶ 18.)

On November 26, 2014, three months after Dr. Marandet submitted the consultation request, he saw Perez for follow-up on his hyperlipidemia[4] condition. (*Id*.

---

[4] Hyperlipidemia is the medical term for high cholesterol. https://www.webmd.com/cholesterol-management/hyperlipidemia-overview#1 (last visited August 28, 2018).

at ¶ 19; ECF 44-2 at 166-68; ECF 47-1 at 10-12.) There is no mention in the medical records that Perez's clubfoot condition or any foot pain were discussed at that visit. (ECF 44-1 at ¶ 19; ECF 44-2 at 166-68.) Perez, however, says that he complained clearly and unequivocally about his difficulties and pain at every visit with a nurse or Dr. Marandet while he was at MCF. (ECF 47-2 at 3.) At this visit, he "explained profusely the amount of pain [he] was in," asked about the surgery consult, and showed Dr. Marandet both feet. (ECF 47-3 at ¶ 17.) The record does not demonstrate that any pain medication was prescribed or that Dr. Marandet took any steps to determine the status of the earlier consultation request.

On December 8, 2014, Dr. Marandet saw Perez for complaints of painful and frequent urination. (ECF 44-1 at ¶ 20; ECF 44-2 at 158-59; ECF 47-1 at 13-14.) There is again no mention in the medical records that Perez's clubfoot condition or any foot pain were discussed at that visit. (*Id*.) Perez, however, says he "again profusely complained about [his] feet, and the excruciating pain [he] was in." (ECF 47-3 at ¶ 18.) Once again, record does not demonstrate that Dr. Marandet prescribed any medication for pain or took any steps to determine the status of the earlier consultation request.

On December 19, 2014, Perez submitted a "Request for Interview" form to Ms. Ivers.

> I want to know what's going on with me going to see the podiatrist that done my surgeries. You said we were waiting on down state. Well it's been months that I signed the form for down state to get what paperwork they wanted. So now I want to know what[']s going on. So I know what I need to do! (I'm still hurting and just want it fixed)[.]

(ECF 47-1 at 18.) Nurse Ivers responded on January 7, 2015, with the following: "Provider put in for new ortho shoes not podiatrist[.] [Y]ou received these." (ECF 47-1 at 18-20; ECF 47-3 at ¶ 14.)

On January 8, 2015, Perez wrote Nurse Ivers again. (ECF 47-1 at 19; ECF 47-3 at ¶ 15.) He referenced the response indicating that the provider requested the consultation with the podiatrist because he needed orthopedic shoes, not to address his pain. He indicated that both he and Nurse Ivers knew that was not true, citing the response to the grievance filed in August. Nurse Ivers responded on January 15, 2015, as follows:

> Originally a consult was done for you to go back to podiatrist. The problem was that you needed ortho shoes to be able to walk. Hanger still had the mold so a new pair was made and issued. At this time the provider does not have consult for podiatrist. He decided to try new ortho shoes. If you are still having problems even with new shoes, please submit a HCR. Thank you.

(ECF 47-1 at 20, 23.)

On January 18, 2015, Perez was seen by Kim E. Penrod, a member of the nursing staff, for complaints of pain in his left toes. (ECF 44-1 at ¶ 21; EF 44-2 at 152-53.) Perez told the nurse that wearing orthopedic shoes was not providing any relief for his foot pain. (*Id.*) He was referred for a medical provider visit. (*Id.*)

On January 19, 2015. Perez filed a second formal grievance in an attempt to obtain approval to see his podiatrist. (ECF 47-1 at 40.) R. Byrun responded on January 23, 2015, indicating that his complaint has been investigated in his prior grievance, and that his time to appeal that grievance had expired. (*Id.*)

On February 3, 2015, Dr. Marandet saw Perez regarding his toe pain. (ECF 44-1 at ¶ 22.) Perez told Dr. Marandet that the orthopedic shoes were not helping and that he required a wheelchair for long distances. (ECF 44-1 at ¶ 22; ECF 47-1 at 21-22.) He also told Dr. Marandet that he wanted his feet "fixed." (ECF 44-1 at ¶ 22; ECF 47-1 at 21-22.) Dr. Marandet noted that he would submit a request for orthopedic consultation after obtaining updated x-rays of his feet. (ECF 44-1 at ¶ 22; ECF 47-1 at 21-22.) X-rays were taken two days later, on February 5, 2015. (*Id.* at ¶ 23.)

On February 6, 2014, Perez wrote Nurse Ivers to obtain the name of the health provider she was referring to in her January 15, 2015, response. (ECF 47-1 at 23.)

On February 16, 2015, Perez saw Dr. Marandet and Perez again explained that he had been in excruciating pain since arriving at MCF. (ECF 47-3 at ¶ 19; ECF 47-1 at 27-28.) Dr. Marandet submitted a request for a podiatry consultation and included Perez's x-ray results and recent medical records. (ECF 44-1 at ¶ 24; ECF 47-1 at 24-25.) In response, the Regional Medical Director proposed an alternative treatment plan of a short course of prescription-level pain control and a possible referral to long-term pain management if that was not effective in relieving Perez's foot pain. (ECF 44-1 at 25.) On February 18, 2015, in response to the Regional Medical Director's proposed treatment plan, Dr. Marandet submitted a request for a non-formulary medication, tramadol,[5] which was approved. (*Id.* at ¶ 25; ECF 47-1 at 29.)

---

[5] Tramadol is the generic name for Ultram. Ultram is used to treat moderate to severe pain. https://www.drugs.com/ultram.html (last visited August 28, 2018).

Although Dr. Marandet requested an outside provider assessment for follow up on Perez's foot pain, he understood and agreed with the Regional Medical Director's alternative treatment plan. (ECF 44-1 at ¶ 26.) According to Dr. Marandet, Perez's congenital, chronic foot issues are not easily addressed. (*Id.*) He has had many evaluations by outside specialists and multiple surgeries, but they have provided limited relief for his pain and mobility. (*Id.*) Instead, his condition has worsened. (*Id.*) On February 23, 2015, Dr. Marandet saw Perez and discussed the Regional Medical Director's response to Dr. Marandet's request for a podiatry visit. (ECF 44-1 at ¶ 27; ECF 47-1 at 34-35.)

On February 26, 2018, Perez submitted another informal grievance to Nurse Ivers. (ECF 47-1 at 36.) He opined that "pain pills are NOT going to fix the problem," and he needed to see a podiatrist. (*Id.*). Nurse Ivers' response is not entirely legible, but it provides in part that:

> If your orthotics are not appropriate and you continue to have problems you need to submit a HCR to Dr. Marandet only a provider can ….

(ECF 47-1 at 36.)[6]

---

[6] Despite Perez writing Nurse Ivers about his pain and need for medical treatment on five occasions and Nurse Ivers responding to at least three of Perez's inquires, she does not recall communicating with Perez regarding follow-up on his request to see an outside specialist other than responding to his August 28, 2014, grievance. (ECF 44-3 at ¶ 11.) Similarly, Nurse Ivers indicates she has no recollection of meeting Perez. (*Id.* at ¶ 11.) Perez, however, has a clear recollection of meeting Nurse Ivers on March 6, 2014, because after she asked if he was Mr. Perez, she instructed Dr. Marandet not to grant Perez medical idol status, saying that she had addressed that issue in response to Perez's grievance. (ECF 47-1 at 39, 43; ECF 47-3 at ¶ 23; ECF 47-2 at 4.) As a result, the IDOC wanted him to work a job that required standing and walking. (*Id.*) In June of 2015, Dr. Samuel Byrd at Wabash Valley Correctional Center felt that it would not be possible for Perez to work a job requiring prolonged standing, but that he could work a job where he was permitted to sit. (ECF 44-2 at 73.) In October, Dr. Byrd found that medical idol status was "quite reasonable given his inability to ambulate or stand in normal fashion due to severity of foot deformities." (ECF 44-2 at 35.)

On March 6, 2015, Dr. Marandet saw Perez for a chronic care visit. (ECF 44-1 at ¶ 28; ECF 44-2 at 119-21; ECF 47-1 at 37-38.) Perez stated that the Ultram prescribed to help with his foot pain was not effective. (*Id*.) He again requested that he be permitted to see the podiatrist. (*Id*.) Dr. Marandet noted that he would submit a new consult request. (*Id*.)

Perez was transferred to Wabash Valley Correctional Facility on March 19, 2015. (ECF 44-1 at ¶ 29.) On March 25, 2015, the request for an outside podiatry consultation was re-submitted by Dr. Neil Martin at Wabash Valley. (*Id*.) In his request for outside consultation, Dr. Martin noted that Dr. Marandet's earlier request for podiatry follow-up had been met with an alternative treatment plan to try Ultram for pain relief, but Ultram had not adequately addressed Perez's pain. (*Id*.) This request for consultation was granted and, after an office visit to evaluate his condition in April of 2015, Perez had an arthroplasty[7] surgery on June 17, 2015. (*Id*.) A second arthroplasty surgery was performed in September of 2015. (*Id.* at 30.) Despite these surgeries, Perez's medical records reflect that he continued to have foot pain and difficulty ambulating. (*Id*.) However, he received several medications to assist with pain while at Wabash Valley Correctional Facility, including Anafranil, Tegretol, and Neurontin. (ECF 47-2 at 10; ECF 44-2 at 1-116.)

---

[7] "Arthroplasty is a surgical procedure to restore the function of a joint." https://www.hopkinsmedicine.org/healthlibrary/test_procedures/orthopaedic/arthroplasty_92,P07677 (last visited August 28, 2018).

Dr. Marandet asserts that he believed he provided appropriate care to all inmates he treated, including Perez. (ECF 44-1 at 31.) He indicates that he did not knowingly disregard Perez's medical needs, and does not believe anything he either did or failed to do posed a substantial risk to Perez. (*Id.*)

Similarly, Nurse Ivers believed the medical staff were providing appropriate medical care to inmates. (ECF 44-3 at 12.) She indicates that she was never deliberately indifferent to Perez's needs, and that she does not believe that anything she did or failed to do within the course of her duties presented a substantial medical risk to Perez or any other inmate. (*Id.*)

ANALYSIS

To establish liability under the Eighth Amendment, a prisoner must show: (1) his medical need was objectively serious; and (2) the defendant acted with deliberate indifference to his medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994.) Where, as here, a plaintiff alleges a delay in providing medical care, the plaintiff must also produce "verifying medical evidence" that the delay had a detrimental effect. *Langston v. Peters*, 100 F.3d 1235, 1240-41 (7th Cir. 1996)(agreeing with the Eighth Circuit that "[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place *verifying medical evidence* in the record to establish the detrimental effect of delay in medical treatment to succeed" and quoting *Beyerbach v. Sears,* 49 F.3d 1324, 1326 (8th Cir.1995) (emphasis added)).

A medical need is "serious" if it is one that a physician has diagnosed as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention, and if untreated could result in further significant injury or unnecessary pain, and that significantly affects the person's daily activities or features chronic and substantial pain. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). Defendants concede that Perez had an objectively serious medical need. (ECF 43 at 13.)

Deliberate indifference "requires the prisoner to show that the prison official was subjectively aware of the prisoner's serious medical needs and disregarded an excessive risk that a lack of treatment posed to the prisoner's health or safety." *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001). Deliberate indifference is a high standard, and is "something approaching a total unconcern for a prisoner's welfare in the face of serious risks," or a "conscious, culpable refusal" to prevent harm. *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992). As the Seventh Circuit has explained:

> [C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, i.e., the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so.

*Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005)(internal quotations and citations omitted).

Medical professionals are not deliberately indifferent to an inmate's medical needs unless their decisions represent "such a substantial departure from accepted

professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008)(citations omitted). As the Seventh Circuit has explained:

> [M]edical professionals are not required to provide proper medical treatment to prisoners, but rather they must provide medical treatment that reflects professional judgment, practice, or standards. There is not one proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field. A medical professional's treatment decisions will be accorded deference unless no minimally competent professional would have so responded under those circumstances.

*Id.* at 697-98 (internal quotations and citations omitted). Negligence, incompetence, or even medical malpractice do not amount to deliberate indifference. *See Pierson v. Hartley*, 391 F.3d 898, 902 (7th Cir. 2004); *Walker v. Peters*, 233 F.3d 494, 499 (7th Cir. 2000).

Furthermore, a prisoner is not entitled to demand specific care, nor is he entitled to the "best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Where the defendants have provided some level of care for a prisoner's medical condition, in order to establish deliberate indifference the prisoner must show that "the defendants' responses to [his condition] were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). Yet, "[a] doctor who provides some treatment may still be held liable *if he possessed a sufficiently culpable mental state*." *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016) (emphasis in original). A mere disagreement with medical professionals

about the appropriate treatment does not amount to an Eighth Amendment violation. *Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003). "While evidence of malpractice is not enough for a plaintiff to survive summary judgment on an Eighth Amendment claim, nor is a doctor's claim he did not know any better sufficient to immunize him from liability in every circumstance." *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016).

"[D]eliberate indifference to prolonged, unnecessary pain can itself be the basis for an Eighth Amendment claim." *Smith v. Knox Cty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012). "[T]he length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010)(collecting cases demonstrating that a delay of even a couple days in treating a painful condition can constitute deliberate indifference). The defendant, however, must know that treatment is being delayed. *See Zentmyer v. Kendall County*, 220 F.3d 805, 812 (7th Cir. 2000); *Cumbee v. Ghosh,* No. 11-CV-3511, 2016 WL 5404597, at *3 (N.D. Ill. Sept. 28, 2016). With these principles in mind, the court turns its attention to Dr. Marandet and Nurse Ivers.


Dr. Marandet

Taken in the light most favorable to Perez, the facts show that Dr. Marandet knew that Perez was in excruciating pain on June 19, 2014, but he did not offer pain medication and did not refer him to a specialist. Instead, he offered to try to locate the orthopedic shoes that were lost when Perez changed facilities. On August 21, 2014, Perez again told Dr. Marandet that he was in severe pain. Dr. Marandet did not provide

pain medication, but he agreed to submit a request that Perez see the podiatrist because he felt that another consultation could be of value in determining a future course of treatment. (ECF 44-1 at ¶ 16.)

Perez then filed an informal grievance. His grievance states that he attempted to resolve his complaint with Dr. Marandet, and Dr. Marandet told Perez he did not know what happened but he would resubmit the request. (ECF 47-1 at 3.) It is unclear if he resubmitted the request or not, but what is clear is that Perez did not either receive pain medication or see a specialist between August and when he next saw Dr. Marandet in November. Although the medical records do not confirm it, Perez contends that he complained of pain at both his November 26, 2014, and December 8, 2014, medical appointments with Dr. Marandet. (ECF 47-3 at ¶¶ 17-18.) And yet Dr. Marandet still took no further action to address Perez's pain. If Perez's testimony is credited, a reasonable jury could infer that Dr. Marandet's failure to respond in any meaningful way to Perez's continued complaints of pain in late 2014 - complaints that he had consistently voiced since he first saw Dr. Marandet in June - constitutes deliberate indifference.

Nurse Ivers

Taken in the light most favorable to Perez, Nurse Ivers was aware that Perez was experiencing excruciating pain since shortly after he filed his formal grievance on August 28, 2014. Certainly she knew of his complaint of pain and that Dr. Marandet's referral to see a podiatrist had not been effectuated by September 15, 2014, because she

responded to Perez's September 6, 2014, inquiry on that day, indicating that the consult was awaiting approval.

Nurse Ivers contends that her only role was to respond to inquiries from the grievance coordinator, but she did in fact write Perez on September 15, 2014. On October 15, 2014, Nurse Ivers was again made aware that Perez's medical needs were not being met when Perez's ex-wife inquired about his care. And, on November 11, 2014, Perez again made Nurse Ivers aware that he remained in pain and the doctor's referral to the podiatrist still had not been approved. "[A] nurse confronted with an inappropriate or questionable practice should not simply defer to that practice, but rather has a professional obligation to the patient to take appropriate action, whether by discussing the nurse's concerns with the treating physician or by contacting a responsible administrator or higher authority." *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010) (internal quotation marks omitted)); *see also Lewis v. McLean*, 864 F.3d 556, 564–65 (7th Cir. 2017). Yet, after being aware that Perez was in pain and that Dr. Marandet's request that Perez be permitted to see a specialist had still not been either approved or denied two and a half months later, Nurse Ivers did nothing.

Moreover, on January 8, 2014, Nurse Ivers changed course, claiming that the consult was no longer being pursued because the purpose of the consult was to get Perez orthopedic shoes, and they were able to have new orthopedic shoes made without him seeing the podiatrist. But, a reasonable jury could find that the medical record demonstrates that Dr. Marandet intended that the consult with a podiatrist address Perez's pain, not orthopedic shoes, and that Nurse Ivers' December 12, 2014,

explanation of why the consultation was no longer being pursued was disingenuous. Furthermore, Nurse Ivers claims she has no recollection of any communication with Perez regarding follow-up to see an outside specialist other than her response to Perez's August 28, 2014, grievance. Yet, the record establishes that in addition to the formal grievance and response, Perez wrote Nurse Ivers on five occasions and Ivers responded on at least three occasions. Again, a reasonable jury could find Nurse Ivers' alleged inability to recall any of these communications disingenuous. When Nurse Ivers' failure to take any action despite being aware of Perez's suffering is considered along with her assertion in December that there was no longer a need for the consultation with the podiatrist and her inability to remember any of the numerous communications she had with Perez, a reasonable jury could find that Nurse Ivers was deliberately indifferent to Perez's pain.

Verifiable Medical Records

As noted earlier, where a plaintiff alleges a delay in providing medical care violates the Eighth Amendment, the plaintiff must also produce "verifying medical evidence" that the delay had a detrimental effect. *Langston*, 100 F.3d at 1240-41 (7th Cir. 1996); *see also Petties,* 836 F.3d 722, 730-31 ("To show that a delay in providing treatment is actionable under the Eighth Amendment, a plaintiff must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain.")(citation omitted). This does not, however, require expert medical testimony. "[A] non-trivial delay in treating serious pain can be actionable even without expert

medical testimony showing that the delay aggravated the underlying condition." *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010)(citing *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008)).

Perez arrived at the MCF in June of 2014, and was transferred to Wabash in March of 2015. The medical records establish that Perez complained of pain in his feet from his first opportunity, and that he continued to complain of pain consistently throughout his time at the MCF. Even though there were concerns that his surgery in 2013 may have failed, the medical records show that he was not permitted to consult with the surgeon even once during the course of his time at MCF and he received only a short course of tramadol for pain relief after eight months of complaining. The medical records are sufficient to provide independent evidence that delay had a detrimental effect on Perez, because they demonstrate his pain persisted throughout his stay at MCF. Therefore, summary judgment cannot be granted for either Dr. Marandet or Nurse Ivers.

<u>CONCLUSION</u>

For the reasons explained in this order, the court DENIES the defendants' summary judgment motion (ECF 42).

SO ORDERED on August 29, 2018

        \_\_\_\_\_/s/ JON E. DEGUILIO\_\_\_\_\_
        JUDGE
        UNITED STATES DISTRICT COURT